The STATE of Ohio, Appellee,

v.

BAKER, Appellant.

[Cite as *State v. Baker* (1993), 92 Ohio App.3d 516.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 64248.

Decided Dec. 20, 1993.

518

520

*Stephanie Tubbs Jones,* Cuyahoga County Prosecuting Attorney, and *L. Christopher Frey,* Assistant Prosecuting Attorney, for appellee.

*David L. Doughten,* for appellant.

DONALD C. NUGENT, Judge.

This is an appeal from a judgment of conviction and sentence of defendant-appellant Raymond Baker, Jr. from the Cuyahoga County Court of Common

Pleas, resulting from a jury verdict finding appellant guilty, as indicted, of aggravated arson in violation of R.C. 2909.02.

In September 1988, Claud Hill, his wife, son, daughter and granddaughter rented the upstairs portion of a house owned by appellant's uncle and lived in by appellant's father prior to his death in June 1988. Prior to appellant's father's death, Hill paid $100 per month rent to appellant's father and also took care of appellant's father. However, after the funeral, appellant was given permission to collect the rent from the Hills. Appellant and Hill apparently agreed that the Hills would rent the entire house for $200 per month.

According to Hill, on September 28, 1988, appellant came to collect the rent money from Hill. On cross-examination, Hill stated that although he normally paid the rent on the third or fourth of the month, Hill paid appellant $125 while Hill's daughter gave appellant $50. Although it is not exactly clear from Hill's testimony, at some point, appellant kicked in either the door leading upstairs or the door leading into the kitchen. An argument ensued wherein appellant told Hill "to pay the rent or get out and if they didn't, [appellant] would burn the house down." Appellant also threatened Hill's wife.

After the argument, appellant left the house and went outside toward Evelyn Blair's house while Hill went back to the porch to watch television. Before leaving the house, however, appellant told Hill that he would be back for the rest of the rent money.

Shortly thereafter, Hill smelled smoke. Hill went downstairs and saw appellant packing his clothes. Appellant told Hill that he was getting his clothes because he was moving. After Hill went back upstairs, appellant apparently returned and asked for more money. Hill told appellant that he did not have any more money and that appellant would have to wait for next month. Appellant responded by telling Hill, "I tell you what I'm going to do. I'm going to put you and your wife out. I'm going to set this house on fire." According to Hill, appellant then left the upstairs portion of the house.

Shortly thereafter, Hill again smelled smoke. Hill went downstairs and saw smoke coming out the side door. Hill further saw appellant coming out the side door. Appellant told Hill he was packing his clothes and leaving. Hill proceeded into the dining room and observed fire coming up the side of the wall onto the curtains and downward onto the rug.

On direct examination, Hill claimed that the fire started in the dining room and went back into Baker's bedroom. Hill grabbed a bucket of water and attempted to put the fire out. Further, according to Hill, when the fire department arrived, the fire was still burning in the basement. Hill claimed that the fire department had to tear up half the floor to get to the basement in order to put out the fire.

On cross-examination, Hill claimed to have put out the fire and then proceeded to call the fire department. After having called the fire department, Hill heard Evelyn Blair from her front porch screaming to his wife that there was a fire and to get out of the house.

Evelyn Blair also testified on behalf of the state. At approximately 8:00 p.m. on September 28, 1988, she was walking home from a friend's house when appellant called her. Appellant, who was standing at the gate to Blair's house, told Blair, "Miss Evelyn, I'm going to set that house afire." Blair pleaded with appellant not to; however, appellant responded, "Look, Miss Evelyn, I've already set it afire." Blair looked up and noticed that the downstairs portion of the house was on fire. Blair stood there for a few seconds in shock before she ran to her porch and screamed for Mrs. Hill to get her family out of the house.

After the fire, Hill and his family remained in the house with permission from appellant's cousin. Apparently, appellant's cousin inherited the house from appellant's uncle. Hill agreed to repair the damage in the house in lieu of rent. Hill stated it took four days and two nights to repair the fire damage. Apparently, Hill and his family have remained in the house rent-free.

On cross-examination, Hill testified that he actually saw appellant light the fire. Hill stated that appellant had paper which he was lighting and throwing to the ground. However, because Hill did not believe appellant would set the house on fire, Hill went back upstairs to watch television. Hill further acknowledged that he made a statement to the police concerning the fire. Hill's statement to the police was used by defense counsel in an effort to impeach his trial testimony. He acknowledged that he told the police appellant threatened to burn the house down three weeks earlier, but not on the day of the fire. Hill also acknowledged that he never told the police he actually saw appellant light the fire. Finally, Hill stated that he told the police appellant left the scene in a car. Hill, however, adamantly denied at trial that he saw appellant leave in a car.

Albert Lugo, an investigator with the Fire Investigation Unit of the Cleveland Fire Department, testified last for the state. Lugo, who has eight and one-half years of experience with the fire department, three and one-half years of which have been as an investigator, testified that he was called to investigate the instant fire approximately one hour after the fire department had arrived at the scene. Lugo was assisted in his investigation by Lt. Campbell, who took several photographs of the fire, which were admitted into evidence. Lugo testified that the fire had several points of origin, which eliminates the possibility that it was accidentally started. It was Lugo's opinion, then, that the fire was purposely set.

Lugo inspected the dining room where all of the damage occurred. Lugo testified that the window frame had light-to-medium charring and would need replacing; the wall had light-to-medium charring from the bottom near the floor

to the ceiling; and the carpeting had some burn patterns. Lugo further stated that he observed burnt paper in the middle of the dining room carpet and burn patterns in the wall next to the window and curtains. The ceiling had sustained some smoke damage, while the paint on the ceiling and wall had peeled and would need repainting. Further, the carpeting would need replacing due to the burn marks. Finally, Lugo acknowledged that the fire did not burn a hole through the dining room floor, nor was there a fire in the basement.

Reverend Earl Owens testified first on behalf of appellant. Rev. Owens testified that on July 25, 1989, he went to the house in question to pick up clothing for appellant. Rev. Owens met Evelyn Blair and spoke to her about the fire. Blair told Rev. Owens that on the night of the fire, appellant told her that he would burn the house down if he could not get in and that Claud Hill was not letting him in the house. Evelyn Blair also told Rev. Owens that on the night of the fire, she told appellant the house was on fire and that appellant just said, "Yeah," and walked away. Rev. Owens further testified that when he went to the house to pick up appellant's clothing, he met Claud Hill. Rev. Owens told Hill that he was there to pick up appellant's clothes. Hill responded by telling Rev. Owens, "He [appellant] don't need any clothes where he's going, because he's going to the penitentiary. I'm going to send him there." Sometime later, Rev. Owens went back to the house to get appellant's clothes. Hill told Rev. Owens that appellant's shoes were burned in the fire; however, Hill eventually gave appellant's shoes to Rev. Owens.

Appellant testified next. Appellant explained that the house in question was originally owned by his uncle. When his uncle died, the house passed to the wife, then to the kids. Eventually, appellant's cousins told appellant he could buy the house for $500. After appellant's father died, appellant's cousins asked appellant to collect rent from the Hills. Appellant was to keep the rent and fix the house as he saw fit.

After Hill's daughter and granddaughter moved into the house, appellant and Hill agreed that the Hills could rent the whole house for $200 per month. According to appellant, Hill gave appellant $125 in mid-August. Thereafter, sometime in September, Hill told appellant he was not going to pay any more rent. Consequently, appellant told Hill he could no longer stay in the house.

Appellant admitted that in mid-September, he kicked in a door to the house because Mrs. Hill would not let him in. The next day, appellant returned to collect rent, but was not permitted inside. Appellant acknowledged that he told Hill, "Look, either give me the rent money, move out, or I'll burn the place down. I would rather have it burnt down then to have you living here for nothing." Hill then hollered and cursed at appellant.

Appellant next testified that he returned to the house three days later. Hill's wife had moved downstairs. Appellant took his father's furniture and sold it. Four days later, appellant returned to the house to discover that Hill had bundled up appellant's clothing and placed it in a plastic bag. Sometime later, appellant returned to the house to find that someone else was living there. Appellant testified that Hill and others laughed about not paying rent. Appellant stated that he spoke with Hill downstairs. Appellant told Hill that he would pick up the rest of his father's belongings and give Hill the house. According to appellant, Hill cursed at appellant and told him he wasn't taking anything.

Appellant returned again on the 27th and told the Hills they were going to have to move out. Hill, however, refused to move.

Finally, on September 28, 1988, appellant returned to the house. Appellant stated that it was a cold and rainy day and a window had been left open. In order to warm the house, appellant attempted to turn on a stove in the dining room. However, the pilot light had blown out. Appellant testified that he attempted to light the pilot light with paper that he rolled up. As the individual pieces of paper burned to the end, appellant would throw the paper behind him to the floor. Appellant was not having much success lighting the stove. Eventually, however, he lit the stove and stayed in the house for approximately two to three minutes before turning down the stove and leaving.

As appellant walked down the street toward his car, he met Blair. Appellant stated that he turned around and noticed that his house was on fire. Appellant said to Blair, "Oh, look here, I done set the house on fire." According to appellant, Blair started hollering to the Hills. Appellant then ran toward his car to get the house keys in order to go back into the house when he heard the fire engines. Appellant watched as the fire department put out the fire. Appellant stated that he stuck around and went back inside the house after the fire was extinguished. However, when appellant saw that there was no damage to the house, he left.

Appellant testified that the next day, he went back to the house and saw Hill. Appellant asked Hill how he was doing, took his work clothes and left. According to appellant, eight to nine days later, he was arrested. Appellant stated that he did not know what he was arrested for and that, had he known a warrant had been issued for his arrest in connection with the fire, he would have turned himself in.

Based on the foregoing, the jury found appellant guilty, as indicted, of aggravated arson in violation of R.C. 2909.02. The trial court sentenced appellant to a term of imprisonment of ten to twenty-five years with ten years to be actual incarceration.

Appellant duly appeals, raising the following assignments of error for our review:

"I. There is constitutionally insufficient evidence to sustain the appellant's conviction for aggravated arson.

"II. The trial court erred by allowing the fire investigator to testify that the fire was purposely set when such testimony constituted an invasion of the province of the jury.

"III. The trial court erroneously instructed the jury that the jury could convict the appellant based upon what a reasonably prudent person would foresee as the result of his conduct and upon a finding of a lesser culpable mental state than 'knowingly,' which is the culpable mental state required to sustain a conviction for aggravated arson and thereby deprived the appellant of his constitutionally guaranteed right to due process of law.

"IV. The trial court violated the appellant's right to a speedy trial contrary to the requirements of R.C. § 2945.71–§ 2945.73.

"V. The verdict is against the manifest weight of the evidence."

I

In appellant's fourth assignment of error, appellant argues the trial court erred in overruling his motion to dismiss for lack of a speedy trial in violation of R.C. 2945.71 *et seq.* It is undisputed that appellant was arrested on October 12, 1988 for the offense in question. Appellant further argues that his trial did not commence until July 31, 1989, two hundred ninety-three days after the date of his arrest. Finally, appellant argues that he is entitled to the triple-count provisions of R.C. 2945.71(E), since he was held in jail in lieu of bail solely on the pending charge. In sum, appellant argues he should have been brought to trial in ninety days pursuant to R.C. 2945.71(E).

R.C. 2945.71(C)(2) and (E) require the state to bring a felony defendant to trial within two hundred seventy days of arrest or within ninety days if the accused is held in jail in lieu of bail on the pending charge. Thus, each day during which the accused is held in jail in lieu of bail on the pending charge is subject to the triple-count provision of R.C. 2945.71(E).

When a criminal defendant alleges in his motion that he was incarcerated "solely on this pending charge" and then demonstrates he was not brought to trial within the limits imposed by the triple-count provision of R.C. 2945.71(E), he presents a prima facie case for discharge. *State v. Butcher* (1986), 27 Ohio St.3d 28, 30–31, 27 OBR 445, 446–447, 500 N.E.2d 1368, 1369–1370. At that point, it

becomes the state's obligation to produce evidence demonstrating the defendant was not entitled to be brought to trial within the limits of R.C. 2945.71(C) or (E).

In the present case, it is undisputed that appellant was arrested on October 12, 1988 and that trial commenced on July 31, 1989. Therefore, counting from the day following appellant's arrest to the date of commencement of his trial, two hundred ninety-one days had elapsed. See *State v. Steiner* (1991), 71 Ohio App.3d 249, 250–251, 593 N.E.2d 368, 369 ("The day of arrest is not to be included when computing the time within which a defendant must be brought to trial."); see, also, R.C. 1.14 and Crim.R. 45. Accordingly, pursuant to the two-hundred-seventy-day provision of R.C. 2945.71(C) or the triple-count (ninety-day) provision of R.C. 2945.71(E), appellant has demonstrated a prima facie case for discharge.

Once appellant has demonstrated a prima facie case for discharge, it becomes the state's obligation to produce evidence demonstrating the defendant was not entitled to be brought to trial within the limits of R.C. 2945.71(C) or (E). *Butcher, supra.* The state contends that the triple-count (ninety-day) provision of R.C. 2945.71(E) does not apply because appellant was being held in jail in lieu of bail on more than one charge. The state contends that in addition to the charge under the instant indictment, appellant was being held on additional charges stemming from case No. CR–231,093.

The following colloquy appears in the transcript of proceedings concerning appellant's motion to dismiss for lack of a speedy trial:

"MS. HARBER [Assistant County Prosecutor]: Just briefly, your Honor, the defendant had two cases, and the prosecutor consulted with the Court records, specifically with your bailiff's records and docket entries for these dates.

"THE COURT: I'm going to overrule the motion for speedy trial.

"MR. ROSE [APPELLANT'S TRIAL COUNSEL]: Might I just interject, in an abundance of caution, and to protect the record?

"THE COURT: Okay.

"MR. ROSE: Any records or any other documentation referred to in this motion could the Court kindly mark it as its own exhibit and attach it to any transcript of these proceedings, make copies thereof?

"MS. HARBER: Your Honor—

"MR. ROSE: I just don't feel the prosecutor's office can sit and indicate for the record something she has absolutely no knowledge of, admittedly hearsay, saying she talked to somebody else about, and have it taken by anybody as true.

"THE COURT: Obviously the Court's records are part of the record. If there is an appeal on this case those records will be made available."

Notwithstanding the above, these records are not a part of the record presented to this court in the case *sub judice*.[1] The record before this court does not contain any evidence of the proceedings before the trial court in case No. CR–231,093.

The importance of a record supporting the trial court's ruling was emphasized in *State v. Butcher, supra.* In *Butcher,* the Ohio Supreme Court held that it is the state's responsibility to document its position at the oral hearing on a motion to dismiss for lack of speedy trial by way of records demonstrating the existence of other pending charges. It is, therefore, the state's responsibility to demonstrate that the defendant is being held in jail in lieu of bail on additional charges and not solely on the pending charge. See R.C. 2945.71(E). The court noted that "court records, journal entries or jail records are but some of the means by which the state could have placed evidence in the record to support its position that appellee [the defendant] was not confined in jail solely on the pending charge." *Butcher, supra,* 27 Ohio St.3d at 30, 27 OBR at 446, 500 N.E.2d at 1370, fn. 4. The court concluded by holding that "the record unequivocally demonstrates the state's failure to introduce evidence sufficient to rebut appellee's *prima facie* motion for discharge and, therefore, we are constrained to hold that the conviction was properly reversed on speedy trial grounds." *Id.,* 27 Ohio St.3d at 31, 27 OBR at 447, 500 N.E.2d at 1370.

Six years later, in *State v. Brown* (1992), 64 Ohio St.3d 476, 480, 597 N.E.2d 97, 99, the Ohio Supreme Court reviewed the entire record to determine whether the defendant was held in jail in lieu of bail solely on the pending charge. In *Brown,* the existence of a valid parole holder was challenged for the first time on appeal. The Supreme Court, however, noted that the existence of a valid parole holder was acknowledged by the defendant's counsel at the oral hearing on the motion to dismiss and at a pretrial conference. The Supreme Court concluded that it must presume the set of facts which validates, rather than invalidates, the judgment below. *Id.* at 481, 597 N.E.2d at 100, citing *State v. Brandon* (1989), 45 Ohio St.3d 85, 87, 543 N.E.2d 501, 503. In its syllabus, the court in *State v. Brown* held:

---

1. It is well settled that it is appellant's obligation to provide this court with the record of the proceedings below. See App.R. 9(B); and *State v. Skaggs* (1978), 53 Ohio St.2d 162, 7 O.O.3d 243, 372 N.E.2d 1355. Appellant herein did request an App.R. 9(B) record of the proceedings below for case No. CR–232,548, the present case. Had the state wished to supplement the record before us with the record from No. CR–231,093, it merely could have filed a motion to supplement the record pursuant to App.R. 9(E).

Pursuant to App.R. 9(E), this court could also supplement the record. However, because we find sufficient evidence to support the trial court's ruling, we choose not to do so on this occasion. We nonetheless stress that the prosecution bears the ultimate burden to supplement the record in situations as the one *sub judice*.

"When a defendant makes no request to the trial court to state findings of fact in support of an order overruling a motion to dismiss on speedy trial grounds, and the trial court does not state its findings of fact, an appellate court errs in reversing a conviction on the ground that the defendant was denied a speedy trial if there is sufficient evidence demonstrating that the trial court's decision was legally justified and supported by the record." *Id.*

■ Thus, while it is the state's responsibility to produce evidence demonstrating that the defendant was not entitled to be brought to trial within the limits of R.C. 2945.71(E), a reviewing court will not reverse a trial court's decision overruling a motion to dismiss for lack of a speedy trial where the defendant does not request and the trial court does not state its findings of fact if there is sufficient evidence demonstrating that the trial court's decision is legally justified and supported by the record.

■ In the present case, appellant contested the existence of additional pending charges against him at the trial court's hearing on his motion to dismiss, and appellant contests the same before this court. At the oral hearing, the assistant prosecutor maintained that appellant had two cases against him and that the court's records demonstrated as much. Appellant's counsel requested the court to mark such documents as its own exhibits and maintained that the prosecutor's office should not be able to rely on such documents and "have it taken by anybody as true." The trial court responded by noting that such records would be made available on appeal. However, as previously noted, these records are not before this court. Thus, this court can only conclude that there is not sufficient evidence demonstrating that appellant was held in jail in lieu of bail on additional charges. Accordingly, this court must apply the triple-count provisions of R.C. 2945.71(E).

Applying the triple-count provisions to the case herein, appellant must have been brought to trial within ninety speedy-trial days of his arrest on October 12, 1988. As previously stated, appellant was brought to trial on July 31, 1989, two hundred ninety-one days after the date of his arrest. Thus, this court must look to the record of the case herein to determine if there is sufficient evidence demonstrating that the trial court's decision overruling appellant's motion is legally justified and supported by the record.

■ R.C. 2945.71 provides for reasonable extensions of time within which an accused must be brought to trial. Pertinent to this appeal, R.C. 2945.72 provides:

"The time within which an accused must be brought to trial, or, in the case of felony, to preliminary hearing and trial, may be extended only by the following:

" * * *

"(D) Any period of delay occasioned by the neglect or improper act of the accused;

"(E) Any period of delay necessitated by reason of a plea in bar or abatement, motion, proceedings, or action made or instituted by the accused;

" * * *

"(H) The period of any continuance granted on the accused's own motion, and the period of any reasonable continuance granted other than upon the accused's own motion[.]"

The state argues that the speedy trial requirements were tolled by numerous continuances granted upon appellant's motion. The following journal entries and motions are contained in the record before this court:

| | |
|---|---|
| December 9, 1988: | Pretrial held. Pretrial reset at defendant's request to January 10, 1989. |
| January 10, 1989: | Trial scheduled for January 23, 1989. |
| January 23, 1989: | Trial continued as Attorney Joe Rose is engaged in trial. Trial reset to February 13, 1989. |
| February 13, 1989: | Trial continued at defendant's request as attorney Joe Rose engaged in trial. Trial reset to March 26, 1989. |
| March 6, 1989: | Defendant files a motion to dismiss for lack of a speedy trial. |
| March 26, 1989: | Defendant ill. Defendant in hospital. Trial continued at defendant's request. Attorney to notify court upon defendant leaving hospital and physically able to come to court. |
| July 24, 1989: | Defendant files a motion for discovery, a motion for a bill of particulars, and a motion to voir dire identification witnesses. |

The record does not contain any further journal entries concerning the availability of the defendant for trial, nor does it contain a journal entry setting the matter for trial. Nonetheless, the transcript of the proceedings below provides this court with additional evidence upon which to base our decision.

The transcript of the proceedings reveals that on Wednesday morning, July 26, 1989, the parties were in court and appellant was represented by counsel. The matter had been set for trial on the 25th, and the assistant prosecutor stated on the record that she was prepared to proceed to trial on the 25th. However, appellant's counsel stated, on the record, that appellant was having a problem securing civilian clothing to wear at trial. Appellant's counsel stated that, although appellant wished to proceed to trial, "we are not prepared to go forward

today with out [*sic,* our] trial in chief. Of course, stating that, not waiving any other objections timewise or motions that we have filed. We feel that to do so, in his present garb [jail clothing] that he has on would certainly be prejudicial to him in that regard, your Honor." In light of appellant's counsel's statements, the trial court granted a continuance until the following day. The court then proceeded to resolve various disputes concerning appellant's motions for discovery and for a bill of particulars, both of which were filed on July 24, 1989.

The following morning, Thursday, July 27, the parties were present and appellant was represented by counsel. However, because the trial judge was a witness in another case, the trial court continued the matter, without objection, until Monday, July 31, 1989. Finally, on July 31, 1989, this cause proceeded to a jury trial.

Based on our review of the entire record, we conclude that two hundred twenty-one days were tolled pursuant to R.C. 2945.72. Accordingly, appellant was brought to trial within seventy speedy trial days using the triple-count formula.

Appellant's numerous requests for continuance account for the bulk of time tolled from the speedy trial requirements. R.C. 2945.72(H) provides that the time within which an accused must be brought to trial may be extended by "the period of any continuance granted on the accused's own motion, and the period of any reasonable continuance granted other than upon the accused's own motion." The court's journal entry dated December 9, 1988, which, at defendant's request, continued the pretrial from that date to January 10, 1989, tolls the speedy trial statute thirty-two days. The court's journal entry dated January 23, 1989, which continued the trial to February 13, 1989, due to appellant's trial counsel's involvement in another trial, tolled the speedy trial statute twenty-one days. Likewise, the court's journal entry dated February 13, 1989, which continued trial to March 26, 1989, because defendant's trial counsel was engaged in another trial, tolled the speedy trial statute another forty-two days (the 26th being a Sunday). Finally, the court's journal entry dated March 26, 1989, which continued trial at defendant's request, until such time as defendant's attorney notified the court that the defendant was out of the hospital and able to attend trial, tolled the speedy trial statute an additional one hundred twenty days until July 25, 1989.

 With respect to continuances, the Ohio Supreme Court has required that (1) the granting of a continuance be recorded by the trial court in its journal, (2) the journal entry identify the party to whom the continuance is chargeable, and (3) if the trial court is acting *sua sponte,* the journal entry so indicate and set forth the reasons justifying the continuance. See, *e.g., State v. Mincy* (1982), 2 Ohio St.3d 6, 8, 2 OBR 282, 283–284, 441 N.E.2d 571, 572; and *State v. Siler* (1979), 57 Ohio St.2d 1, 3, 11 O.O.3d 1, 2, 384 N.E.2d 710, 711. The trial court is

not required to briefly set forth the reasons for granting a continuance at the defendant's request. See *State v. Cripple* (May 20, 1993), Cuyahoga App. No. 61773, unreported, at 12, 1993 WL 173733. A review of the above journal entries reveals full compliance with *Mincy* and *Siler.*

 With respect to the court's journal entry dated March 26, 1991, this court will not hold that the trial court abused its discretion in granting defendant's motion to continue trial, nor will we penalize the prosecution by allowing the time in which appellant was hospitalized to run against the speedy trial statute's requirements. It is well settled that a trial court may permit a motion to be made orally. See Crim.R. 47. Moreover, while a motion for a continuance of trial should be made in writing, see C.P.Sup.R. 7(A), it is within the trial court's sound discretion to grant an oral motion to continue. See *State v. Unger* (1981), 67 Ohio St.2d 65, 21 O.O.3d 41, 423 N.E.2d 1078, syllabus. Furthermore, while C.P.Sup.R. 7(A) requires a trial court to set a definite date for trial upon the granting of a continuance, this could not be accomplished where the defendant is hospitalized and unable to state when he will be able to attend trial. Accordingly, the trial court ordered appellant's counsel to notify the court upon defendant's leaving the hospital and being physically able to come to court. However, there is no record of appellant's counsel's doing so. Instead, the transcript of the proceedings reveals that the matter was scheduled for trial for July 25, 1989. R.C. 2945.72(D) tolls from the speedy trial statute's requirements "any period of delay occasioned by the *neglect* or *improper act* of the accused." Because the trial court in its journal entry specifically ordered defendant's counsel to notify the court upon defendant's leaving the hospital and being able to come to court, the lack of any record so notifying the court will be charged as delay occasioned by the neglect of appellant's counsel. Moreover, because the next entry in the record is found in the transcript of the proceedings wherein it was acknowledged that trial was set for July 25, 1989, the full one hundred twenty days will be tolled from the speedy trial statute's requirements. We read R.C. 2945.72(D) and (H) together in holding that a motion to continue a trial indefinitely, when granted, tolls the speedy trial statute until the time when the case is reset for trial, where the journal entry granting such continuance requires counsel to notify the court when the defendant is physically able to attend trial and counsel neglects to do so. Counsel's neglect will be imputed to the accused under such circumstances. In such case, we will presume that defendant was unable to attend court until such time as the case is reset for trial.

 As noted, the record reveals that the matter was set for trial on July 25 and again on July 26. On both days, the prosecution appeared and was ready to proceed to trial. However, it is undisputed that appellant's counsel would not proceed to trial due to appellant's being unable to obtain civilian clothing.

Appellant's counsel was very adamant, on the record, about his belief that appellant would be severely prejudiced in the eyes of the jury if he had to proceed to trial wearing jail clothing. Under these circumstances, the trial court granted appellant's motions to continue trial. This court cannot conclude that the court's decision to continue trial on both days was an abuse of discretion. See *State v. Doane* (1990), 69 Ohio App.3d 638, 657, 591 N.E.2d 735, 748. When the record clearly indicates that the continuance was attributable to the defendant, such delay occasioned by the continuance will be assessed to the defendant even in the absence of a court's journal entry. *Brown, supra,* syllabus; *State v. Bumbalough* (1992), 81 Ohio App.3d 408, 410, 611 N.E.2d 367, 368; *State v. Benson* (1985), 29 Ohio App.3d 321, 324, 29 OBR 448, 451–452, 505 N.E.2d 987, 991 (Parrino, C.J., concurring in part and dissenting in part). Thus, the two days occasioned by appellant's request to continue trial in order to obtain civilian clothing will be tolled from the speedy trial statute.

 Finally, the four-day delay occasioned, without objection, by the trial court's *sua sponte* continuance of July 27, 1989 will be tolled from the speedy trial statute. The trial judge stated on the record that he was a witness in a case scheduled the next day and, due to the late hour, decided not to proceed on the 27th. Appellant did not state an objection. R.C. 2945.72(H) states that reasonable *sua sponte* continuances are tolled from the speedy trial statute. Without an objection, this court cannot say that a four-day delay is unreasonable.

Based on the foregoing, this court concludes that two hundred twenty-one days were tolled from the speedy trial statute, bringing appellant to trial in seventy speedy trial days.

Appellant's fourth assignment of error is, therefore, overruled.

## II

In appellant's second assignment of error, appellant argues the trial court committed prejudicial error by allowing Lugo, the fire investigator, to testify that the fire in the instant case was purposely set. Appellant contends that allowing the fire investigator to give his opinion invaded the province of the jury and deprived appellant of his constitutional right to trial by jury and to due process of law.

At trial, Investigator Lugo testified as follows:

"Q. Based upon your experience, and based upon your training, and based upon your examining the residence in the dining area, on that particular evening at 1536 East 81st Street, were you able to determine the cause of the fire?

"A. Yes.

"Q. And what was that?

"MR. ROSE: Objection.

"THE COURT: Overruled.

"A. We determined that this—we determined this to be an incendiary fire, which is purposely set fire.

"BY MS. HARBER:

"Q. And when you say incendiary, what do you mean by that terminology?

"A. Purposely set."

■ The decision to admit expert opinion testimony is a matter generally within the sound discretion of the trial court. *State v. Buell* (1986), 22 Ohio St.3d 124, 133, 22 OBR 203, 210–211, 489 N.E.2d 795, 804; *Schaffter v. Ward* (1985), 17 Ohio St.3d 79, 80, 17 OBR 203, 203–204, 477 N.E.2d 1116, 1116. Evid.R. 702 and 704 govern the admissibility of expert opinion testimony.

■ Evid.R. 704 provides:

"Testimony in the form of an opinion or inference otherwise admissible is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact."

Under Evid.R. 704, expert testimony and opinion is not objectionable simply because it embraces an ultimate issue of fact to be decided by the trier of fact. However, such testimony must first be "otherwise admissible."

Evid.R. 702 governs the admissibility of expert testimony and provides:

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

Thus, Evid.R. 702, in conjunction with Evid.R. 704, permits expert testimony and opinion on "an ultimate issue to be decided by the trier of fact" if the witness is qualified as an expert with "scientific, technical or other specialized knowledge" and if his testimony or opinion will assist or help the trier of fact to understand the evidence or to decide an issue of fact. *Deeds v. Am. Security* (1987), 39 Ohio App.3d 31, 33, 528 N.E.2d 1308, 1311; see, also, *State v. Karns* (1992), 80 Ohio App.3d 199, 202–203, 608 N.E.2d 1145, 1147.

■ In the present case, Investigator Lugo testified to his experience in the field of fire investigation. Lugo has eight and one-half years of experience with the Cleveland Fire Department, with three and one-half years of experience as a fire investigator. Lugo attended school for fire investigation at the National Fire

Academy near Washington, D.C., and has investigated approximately one thousand four hundred fires in three and one-half years. Due to the numerous points of origin, Lugo rendered an opinion that the fire was set purposely. Lugo testified that it was not likely that the fire was set accidentally, since accidental fires usually start in one area. As Lugo's technical or specialized knowledge concerning fire investigations could certainly assist the trier of fact in understanding the evidence or determining a fact at issue, this court finds no error or abuse of discretion in the trial court's ruling admitting Lugo's testimony.

Appellant relies on this court's decision in *State v. Doyle* (Feb. 12, 1987), Cuyahoga App. No. 51608, unreported, at 4, 1987 WL 6541, for the proposition that "when the question is *not* one calling for expert opinion and within the experience, knowledge or comprehension of a jury and there is conflicting eyewitness testimony on the point, allowing an opinion is a clear invasion of the jury's province." Appellant's reliance on *Doyle* is, however, misplaced. The Ohio Supreme Court, in *Schaffter, supra,* held that the syllabus law in *Trebotich v. Broglio* (1973), 33 Ohio St.2d 57, 62 O.O.2d 410, 294 N.E.2d 669, upon which the *Doyle* court relied, is in conflict with Evid.R. 704 and has no further effect.[2] Moreover, *Doyle* involved the admissibility of a lay witness's opinion on an ultimate issue to be decided by the trier of fact. See Evid.R. 701. In the case *sub judice,* this court has already concluded that Lugo's technical or specialized knowledge and expertise were not within the experience, knowledge or comprehension of the jury. Evid.R. 702.

Based on the foregoing, appellant's second assignment of error is overruled.

## III

In appellant's third assignment of error, appellant argues the trial court committed reversible error by instructing the jury that it could convict the appellant based on what a reasonably prudent person would foresee as the result of his conduct. Appellant contends the instruction given to the jury allowed the jury to convict appellant based on a lesser culpable mental state than that required to convict for aggravated arson.

---

**2.** Although this court in *Doyle* acknowledged the *Schaffter* decision in a footnote, we noted that it was based on "factual exigencies" which warranted the admission of expert opinion testimony on the ultimate issue of fact therein. However, the *Doyle* court did not elaborate on what "factual exigencies" distinguished the two cases. Although it *did not expressly state as much,* it is clear that the "factual exigencies" involved concerned the use of a lay witness's testimony in *Doyle* versus an expert witness's testimony in *Schaffter.*

Nonetheless, Evid.R. 704 governs in each situation and provides that an opinion otherwise admissible, see Evid.R. 701 and 702, is not objectionable because it embraces an ultimate issue to be decided by the trier of fact. The existence of "conflicting eyewitness testimony" does not appear to be relevant under either Evid.R. 701 or 702.

R.C. 2909.02(A) states that "[n]o person, by means of fire or explosion, shall knowingly * * * cause physical harm to any occupied structure * * *." "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B).

The trial court gave the following jury instructions:

"The indictment charges aggravated arson. The defendant is charged with aggravated arson. Before you can find the defendant guilty, you must find beyond a reasonable doubt that on or about the 28th day of September, 1988, Cuyahoga County, Ohio, the defendant, by means of fire, knowingly caused physical harm to an occupied structure, and that he did so unlawfully and purposely in that regard, meaning not accidentally.

"What does knowingly mean?

"A person acts knowingly regardless of his purpose, when he is aware that his conduct will probably cause a certain result, or he is aware that his conduct will be of a certain nature. A person has knowledge of circumstances, when he is aware that the circumstances probably exist.

"Knowingly means that a person is aware of the existence of the acts, and his acts will probably cause a certain result.

"Now, since you cannot look into the mind of another, knowledge is determined from all the facts and circumstances in evidence.

"Knowingly cause physical harm. Cause. What does that mean? Cause is an essential element of the offense charged. The state charges that the act of the defendant caused physical harm to an occupied structure.

"Cause is an act which, in the natural and continuous sequence, directly produces the physical harm, and without which it would not have occurred. Cause occurs when the physical harm is the natural and foreseeable result of the act committed.

"Physical harm is the result of an act when it is produced directly by the act, in a natural and continuous sequence but would not have occurred without the act or failure to act.

"Excuse me, we're not talking about failure to act in this case. We're talking about commission of an act. That is what we're talking about.

"Results occurs [sic] when the physical harm is natural and foreseeably caused by the act of the defendant.

"Now, the usual responsibility of the defendant for an unlawful act is not limited to its immediate or most obvious result. He is responsible for the natural, logical and foreseeable results that follow, in the ordinary course of events, from an unlawful act.

"The test for foreseeability is not whether the defendant should have foreseen the injury in its precise form, the test is whether a reasonably prudent person, in light of all of the circumstances would have anticipated that the physical harm was likely to result from the performance of his unlawful act."

Appellant singles out that portion of the trial court's instructions defining "result" as being that which a reasonably prudent person would have foreseen. Appellant argues that this portion of the instruction allowed the jury to convict appellant for aggravated arson on a lesser degree of culpability than that required for aggravated arson, to wit: knowingly.

It is the duty of the trial judge in a jury trial to state all matters of law necessary for the information of the jury in giving its verdict. R.C. 2945.11; *State v. Perryman* (1976), 49 Ohio St.2d 14, 3 O.O.3d 8, 358 N.E.2d 1040; *State v. Mitchell* (1989), 60 Ohio App.3d 106, 574 N.E.2d 573. The trial court is to instruct the jury by clearly and concisely stating the principles of law necessary to allow a fair verdict and the administration of justice. *Pickering v. Cirell* (1955), 163 Ohio St. 1, 56 O.O. 1, 125 N.E.2d 185.

A single instruction to a jury may not be judged in artificial isolation but must be viewed in the context of the overall charge. *State v. Price* (1979), 60 Ohio St.2d 136, 14 O.O.3d 379, 398 N.E.2d 772, paragraph four of the syllabus. A reviewing court must consider the whole charge as given rather than separate portions of a charge. *State v. Grambo* (1947), 82 Ohio App. 473, 38 O.O. 104, 75 N.E.2d 826. Thus, a judgment will not be reversed if a portion of the general charge is improper and misleading unless the entire charge resulted in prejudicial error. *State v. Porter* (1968), 14 Ohio St.2d 10, 43 O.O.2d 5, 235 N.E.2d 520.

In the present case, the trial court's instructions to the jury are patterned after those found in 4 Ohio Jury Instructions (1993), Section 509.02, aggravated arson. The trial court clearly instructed the jury on the requisite *mens rea* for aggravated arson, which included the statutory definition of "knowingly." See R.C. 2901.22(B). Following the standard jury instructions, the trial court then instructed the jury on causation. See 4 Ohio Jury Instructions, Sections 409.55 and 409.56. The court properly instructed the jury that causation occurs when the physical harm is the natural and foreseeable result of the act. A correct instruction on the definition of "natural consequences" and "foreseeability" was then given. See 4 Ohio Jury Instructions, Sections 409.55 and 409.56.

Accordingly, in reviewing the instructions in their entirety, this court concludes that the trial court did not err or abuse its discretion in charging the jury on aggravated arson. The trial court's instructions accurately defined "aggravated arson" and included the statutory definition on "knowingly." The court's charge on "causation" and "foreseeability" could not possibly have confused or misled the jury into believing that a lesser *mens rea* than "knowingly" was required for aggravated arson.

Appellant's third assignment of error is, therefore, overruled.

## IV

In appellant's first and fifth assignments of error, appellant challenges the sufficiency and weight of the evidence. Appellant first contends that there is insufficient evidence to show that any physical harm was done to the house in question. Next, appellant asserts that the principal witness, Claud Hill, had an interest to protect by his testimony, to remain in the house rent-free, and that Hill's testimony was internally contradicted and impeached to the point that Hill lacked any credibility whatsoever.

Reversal of a verdict as being contrary to the weight of the evidence requires the concurrence of all three appeals court judges hearing the case. Section 3(B)(3), Article IV of the Ohio Constitution provides that "no judgment resulting from a trial by jury shall be reversed on the weight of the evidence except by the concurrence of all three judges hearing the cause." See *State v. Porello* (1941), 138 Ohio St. 239, 20 O.O. 281, 34 N.E.2d 198; *State v. Sowell* (1988), 39 Ohio St.3d 322, 530 N.E.2d 1294.

"An appellate court's function when reviewing the [weight or] sufficiency of the evidence to support a criminal conviction is to examine the evidence submitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus; *State v. Franklin* (1991), 62 Ohio St.3d 118, 580 N.E.2d 1; *State v. Chapman* (1992), 73 Ohio App.3d 132, 596 N.E.2d 612.

R.C. 2909.02 states that "[n]o person, by means of fire or explosion, shall knowingly * * * cause physical harm to any occupied structure." " 'Physical harm to property' means any tangible or intangible damage to property which, in any degree, results in loss to its value or interferes with its use or enjoyment. 'Physical harm to property' does not include wear and tear occasioned by normal use." R.C. 2901.01(D).

In the present case, there exists sufficient evidence for the jury to find physical harm to the house in question. Investigator Lugo described the harm to the

house in great detail. Lugo testified that the window frame had light-to-medium charring and would need replacing; the wall had light-to-medium charring from the bottom near the floor to the ceiling; and the carpeting had some burn patterns. Lugo added that the wall and ceiling would need to be painted and the carpet would have to be replaced. Additionally, Hill testified that it took him four days and two nights to repair the damage. Finally, pictures of the damage to the house were admitted into evidence and considered by the jury. These pictures depict the burnt and charred window frame, wall, ceiling and carpeting of the home in question. Thus, sufficient evidence exists to support the jury's verdict finding that physical harm was done to the house in question. The jury could easily have concluded that the physical damage to the home resulted in loss to its value or interfered with its use or enjoyment.

Finally, appellant argues that his conviction is against the manifest weight of the evidence. Appellant contends that Claud Hill's testimony was so biased, inconsistent and impeached that his conviction should be reversed. While Hill's testimony was somewhat confusing, inconsistent and did not go unimpeached, this court concludes that appellant's conviction is not against the manifest weight of the evidence.

A reviewing court will not reverse a jury verdict where there is substantial evidence upon which a jury could reasonably conclude that all the essential elements of the offense have been proven beyond a reasonable doubt. *Jenks, supra;* and *State v. Eley* (1978), 56 Ohio St.2d 169, 10 O.O.3d 340, 383 N.E.2d 132, syllabus. The weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus. It is not the function of an appellate court to substitute its judgment for that of the fact-finder. *State v. D'Ambrosio* (1993), 67 Ohio St.3d 185, 616 N.E.2d 909; *DeHass, supra;* *State v. Thomas* (1982), 70 Ohio St.2d 79, 24 O.O.3d 150, 434 N.E.2d 1356; *State v. Ervin* (1991), 75 Ohio App.3d 275, 599 N.E.2d 366. Furthermore, the trier of fact is entitled to believe or not believe the state's witnesses and/or the defense witnesses. *State v. Antill* (1964), 176 Ohio St. 61, 26 O.O.2d 366, 197 N.E.2d 548.

In the present case, the jury was entitled to believe or disbelieve Hill's testimony. The jury was also entitled to partially believe or disbelieve Hill's testimony. Additionally, appellant's conviction is supported by Blair, who stated that appellant told her, "Miss Evelyn, I'm going to set that house afire. * * * Look Miss Evelyn, I've already set it afire." Blair also testified that, prior to the fire, appellant threatened to burn down the house. Investigator Lugo's testimo-

ny adds additional support to appellant's conviction. Investigator Lugo testified that due to the numerous points of origin, the fire was purposely set.

Appellant's first and fifth assignments of error are, therefore, overruled.

*Judgment affirmed.*

NAHRA, P.J., and BLACKMON, J., concur.